IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UREN NORTH AMERICA LLC,<br>    Plaintiff | § § § | |
| V. | § § | C.A. No. _____<br>Admiralty |
| MEDITERRANEAN SHIPPING<br>COMPANY S.A.,<br>    Defendant | § § § § | |

## COMPLAINT

Uren North America LLC ("Uren"), Plaintiff herein, complains of Mediterranean Shipping Company S.A. ("MSC"), Defendant herein, and in support would show as follows:

## I.
## PARTIES

1. Plaintiff, Uren North America LLC ("Uren"), is a Florida limited liability company with its principal place of business in Florida. Uren was the owner and consignee of the cargo made the basis of this lawsuit, which cargo was shipped in international and interstate commerce. Uren brings this action on its own behalf and on behalf of and for the interests of all parties who may be or become interested in the cargo in question.

2. Defendant, Mediterranean Shipping Company S.A. ("MSC"), was and now is a foreign corporation or similar entity, with power to sue and be sued, which regularly does business within the Southern District of Texas, Houston Division, as a common carrier of goods by water for hire. MSC may be served with Complaint and Summons through its United States general agent, Mediterranean Shipping Company (USA), Inc., through its

Texas registered agent, C.T. Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

## II.
## SUBJECT-MATTER JURISDICTION

3. This Court has subject matter jurisdiction under the Harter Act, 46 U.S.C. 30701 *et. seq.*, as this matter involves damage to cargo internationally transported by water between the time the cargo was discharged from a vessel and the time the cargo left the port area.

## III.
## VENUE

4. Venue is proper in the Southern District of Texas, Houston Division, because Defendant MSC discharged the cargo in this District and Division and the damage to the cargo occurred in this District and Division.

## IV.
## RESPONDEAT SUPERIOR

5. Whenever Uren alleges that MSC did any act or thing, it is meant that MSC's officers, agents, servants, employees, contractors or representatives did such act or thing and at the time such act or thing was done, it was done with the full authorization or ratification of MSC or done in the normal and routine course and scope of employment of MSC's officers, agents, servants, employees, contractors or representatives.

## V.
## FACTS

6. MSC discharged a container containing frozen raspberries from the MSC AGRIGENTO (B/L MSCUW6725532, Container No. CXRU1393762) in good order and condition at the Port of Houston's Bayport Terminal on or about May 22, 2017, with no exceptions taken. MSC had been instructed to maintain the temperature of the container at

-18 degrees celsius in order to prevent damage.  Under the "custom and usage" of the Port of Houston as set forth in its applicable tariff, MSC as carrier was solely responsible for maintaining electrical power to refrigerated containers until the container left the Port.

7.      When the inland trucker first arrived at the Port to pick up the cargo on or about May 24, 2017, no gensets were available as required to provide electric power to the container during inland transportation.  Around that time or soon thereafter, MSC discontinued electrical power to the cargo container and failed to reconnect it, causing the temperature inside the container to rise in excess of 0 degrees celsius by May 29, 2017.  When the trucker returned to pick up the cargo on or about May 29, 2017 (after being advised that a genset was now available), the cargo was damaged.  MSC failed to deliver the cargo in the same good order and condition as MSC received it, which Uren discovered when the container was opened at its destination on or about May 31, 2017.

8.      The value of the cargo in its undamaged state was approximately $55,000.00. MSC granted an extension of suit time up to and including February 28, 2019.

## VI.
## HARTER ACT

9.      MSC, as a common carrier, discharged the cargo from the above vessel at the Port of Houston's Bayport Terminal in good order and condition.  The Harter Act applied by statute during the time between discharge of the container from the vessel and the time the cargo left the Port. Under the Harter Act and the "custom and usage" of the Port, as part of MSC's legal obligation to "deliver" the cargo, MSC was solely responsible for supplying electric power to refrigerate the cargo until the cargo left the Port.  MSC failed to do so, causing damage to the cargo, thus MSC failed to deliver the cargo in the same good order and condition as MSC received it.  MSC thus breached its duties and obligations as a

common carrier under the Harter Act, which breach proximately caused the damage and loss in question.

## VII.
## NEGLIGENCE / BREACH OF CONTRACT / BREACH OF BAILMENT

10. In the alternative, and without waiving the above cause of action, MSC was negligent in handling, storing, keeping and caring for the cargo between the time the cargo was discharged from the vessel and the time the cargo left the Port by failing to maintain refrigeration as instructed, which negligence was a proximate cause of damage to Uren. Uren also relies on the doctrine of *res ipsa loquitur*, as the cargo was damaged while in the care and custody of MSC or MSC's agents or contractors which, in the ordinary course of events, would not have occurred without negligence on the part of MSC and was a proximate cause of the damages in question.

11. In the alternative, and without waiving the above causes of action, MSC entered into a contract with Uren or Uren's agents to safely handle, keep and care for the cargo between the time the cargo was discharged from the vessel and the time the cargo left the Port. MSC failed to maintain refrigeration and thus failed deliver the cargo in the same good order and condition as MSC received it. MSC thus breached its duties and obligations as a common carrier of goods, which breach was a proximate cause of damages to Uren.

12. In the alternative, and without waiving the above causes of action, MSC was a bailee of the cargo between the time the cargo was discharged from the vessel and the time the cargo left the Port. The bailment, for the mutual benefit of MSC and Uren, was made express by bills of lading or alternatively was an implied contract. MSC delivered the cargo in a damaged condition due to lack of refrigeration which did not exist at the time

MSC received the cargo.  MSC breached its duties and obligations as a bailee and was negligent, which breach was a proximate cause of damages to Uren.

## VIII.
## DAMAGES

13. As a direct and proximate cause of the breaches set forth above, the cargo was a total loss and Uren has suffered damages in the amount of at least FIFTY-FIVE THOUSAND AND 00/100 DOLLARS ($55,000.00), plus prejudgment interest, postjudgment interest, and all costs of court.

## IX.
## CONDITIONS PRECEDENT

14. All conditions precedent necessary to maintain this lawsuit have been performed or have occurred.

## X.
## PRAYER

15. WHEREFORE, PREMISES CONSIDERED, Plaintiff Uren prays that, upon final trial, Uren have judgment against Defendant MSC as follows:

   a. Actual damages of at least $55,000.00 for the above-stated causes of action;

   b. Prejudgment interest and postjudgment interest at the maximum legal rate;

   c. All costs of court; and

   d. For such other and further relief, general or special, at law or in equity, to which Plaintiff Uren may show itself justly entitled.

Respectfully submitted,

/s/ *Robert G. Moll*
ROBERT G. MOLL
SDTX I.D. No.: 15213
Texas Bar No.: 00784622
1903 Blooming Park Lane
Katy, Texas 77450
Telephone:     (713) 540-2780
E-mail:        texlaw1992@aol.com

**ATTORNEY FOR PLAINTIFF**
**UREN NORTH AMERICA LLC**